# STATE OF MICHIGAN

# COURT OF APPEALS

DEAN TOWARD,

Plaintiff-Appellant,

v

CITY OF WARREN, ROBERT AHERNS,
WILLIAM WILKE, JAMES MATHENY, and
JERE GREEN,

Defendants-Appellees.

UNPUBLISHED
June 23, 2015

No. 319858
Macomb Circuit Court
LC No. 2012-003474-CD

Before: MARKEY, P.J., and OWENS and GLEICHER, JJ.

PER CURIAM.

Plaintiff appeals by right an order granting summary disposition to defendants, the city of Warren, Robert Aherns, William Wilke, James Matheny, and Jere Green, with respect to plaintiff's Whistleblower Protection Act ("WPA"), MCL 15.361 *et seq.*, intentional infliction of emotional distress, false imprisonment, and conspiracy and concert of action claims. We affirm.

This Court reviews de novo as a question of law whether evidence establishes a prima facie case under the WPA. *Roulston v Tendercare (Mich), Inc*, 239 Mich App 270, 278; 608 NW2d 525 (2000). We also review de novo a trial court's decision regarding a motion for summary disposition. *Hackel v Macomb Co Comm*, 298 Mich App 311, 315; 826 NW2d 753 (2012). We must consider the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial when reviewing a motion under MCR 2.116(C)(10). *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). "Summary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

We conclude that the trial court properly granted summary disposition to defendants pursuant to MCR 2.116(C)(10) because plaintiff has failed to demonstrate a genuine issue of material fact concerning his WPA, intentional infliction of emotional distress, false arrest, and conspiracy and concert of action claims.[1]  We will address each claim in turn.

The WPA provides, MCL 15.362:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

On the basis of this statutory language, our Supreme Court has articulated three elements that a plaintiff must establish to establish a prima facie case of a WPA violation:

> (1) The employee was engaged in one of the protected activities listed in the provision.
>
> (2) [T]he employee was discharged, threatened, or otherwise discriminated against regarding his or her compensation, terms, conditions, location, or privileges of employment.
>
> (3) A causal connection exists between the employee's protected activity and the employer's act of discharging, threatening, or otherwise discriminating against the employee.  [*Wurtz v Beecher Metro Dist*, 495 Mich 242, 251-252; 848 NW2d 121 (2014) (footnotes omitted).]

With respect to the first element, our Supreme Court has noted that "[t]he protected activities listed in the act consist of reporting or being about to report a violation of a law, regulation, or rule, or being requested by a public body to participate in an investigation, hearing, inquiry, or court action." *Id*. at 251 n 13, citing MCL 15.362.  Regarding the second element, the Supreme Court observed that although the broad term "adverse employment action" is sometimes used to describe the retaliatory acts that an employer might take against a whistleblower, *Wurtz*, 495 Mich at 251 n 14, "a plaintiff's demonstration of some abstract 'adverse employment action' as that term has developed in other lines of caselaw will not be sufficient.  Rather, the plaintiff must demonstrate one of the specific adverse employment actions listed in the WPA." *Id*. at 252 n 14.

---

[1] In light of this conclusion, we need not address whether summary disposition of the WPA claim was proper on statute of limitation grounds under MCR 2.116(C)(7).

Concerning the third element, this Court has explained:

A plaintiff may establish a causal connection through either direct evidence or indirect and circumstantial evidence. Direct evidence is that which, if believed, requires the conclusion that the plaintiff's protected activity was at least a motivating factor in the employer's actions. To establish causation using circumstantial evidence, the circumstantial proof must facilitate reasonable inferences of causation, not mere speculation. Speculation or mere conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. In other words, the evidence presented will be sufficient to create a triable issue of fact if the jury could reasonably infer from the evidence that the employer's actions were motivated by retaliation. [*Shaw v City of Ecorse*, 283 Mich App 1, 14-15; 770 NW2d 31 (2009) (quotation marks and citations omitted).]

Indirect evidence of a causal connection between protected activity and an adverse job action may be utilized to establish a rebuttable prima facie case that the plaintiff was the victim of unlawful retaliation. *Debano-Griffin v Lake Co*, 493 Mich 167, 176; 828 NW2d 634 (2013). If the evidence establishes a prima facie case, the burden of proof then shifts to the defendant to offer a legitimate reason for its action. *Roulston*, 239 Mich App at 281. A plaintiff can prove that a defendant's proffered legitimate reason for its conduct is a mere "pretext either directly by persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id*. If the defendant provides a legitimate reason and the plaintiff fails to rebut that legitimate reason, the defendant is entitled to summary disposition. *Hazle v Ford Motor Co*, 464 Mich 456, 465, 477; 628 NW2d 515 (2001). To survive a motion for summary disposition, the plaintiff must raise a triable issue that the defendant's proffered reason was not only pretextual but that it was a pretext *for unlawful retaliation*. *Debano-Griffin*, 493 Mich at 176, citing *Hazle*, 464 Mich at 465-466.

It is well settled that a temporal relationship is insufficient *by itself* to demonstrate a causal connection between the protected activity and an adverse employment action. *West*, 469 Mich at 186. In other words, a "[p]laintiff must show something more than merely a coincidence in time between protected activity and adverse employment action." *Id*. It is true that a temporal connection may be evidence of causation *when combined with additional evidence* that the protected activity caused the adverse employment action. See *Shaw*, 283 Mich App at 15-16; *Roulston*, 239 Mich App at 281-282. But the fact that there was a "short time between [a] plaintiff's participation in protected activity and the termination of [the] plaintiff's employment, without more, is insufficient to establish that the [employer's] stated reason was a mere pretext." *Taylor v Modern Engineering, Inc*, 252 Mich App 655, 662; 653 NW2d 625 (2002). Where a plaintiff fails to present evidence other than the timing of the employment action in relation to the plaintiff's participation in protected activity, a genuine issue of material fact that the adverse action was retaliatory is not created. *Id*. Rather, a plaintiff's reliance solely on the timing of the adverse action only supports speculation. *Id*. "Summary disposition for the defendant is appropriate when a plaintiff cannot factually demonstrate a causal link between the protected activity and the adverse employment action." *West*, 469 Mich at 184.

-3-

First, we agree with plaintiff that a genuine issue of material fact exists concerning whether he engaged in a protected activity. At the time of the relevant events in this case, plaintiff was a police officer for the Warren Police Department (WPD). Plaintiff testified that, after returning to the police station from an incident that occurred on Blackmar Street and in the following days, he verbally reported to his supervisors about another officer's purported misconduct in arresting two teenagers. According to plaintiff, he did not report the alleged misconduct in a subsequent written report because he had already been placed on the front desk and feared further retaliation. "The WPA protects an employee who reports or is about to report a violation or suspected violation of a law or regulation to a public body." *Brown v Mayor of Detroit*, 478 Mich 589, 594; 734 NW2d 514 (2007) (emphasis omitted), citing MCL 15.362. "A 'public body' includes a 'law enforcement agency or any member or employee of a law enforcement agency.' MCL 15.361(d)(*v*). It does not matter if the public body to which the suspected violations were reported was also the employee's employer." *Id*. at 595. Plaintiff's verbal reports to his supervisors at the WPD concerning another officer's purported misconduct amounting to an illegal arrest of the two teenagers in the Blackmar incident comprised a report of a suspected violation of a law or regulation to a public body. Although plaintiff did not report this misconduct when he subsequently prepared a written report, plaintiff's explanation that he omitted this information from his written report because he feared further retaliation presents a question of credibility. A court may not assess credibility when deciding a motion for summary disposition. *Anzaldua v Neogen Corp*, 292 Mich App 626, 637; 808 NW2d 804 (2011). Plaintiff's verbal reports were sufficient to establish a protected activity. See MCL 15.362.

But we agree with defendants and the trial court that plaintiff has failed to demonstrate a genuine issue of material fact concerning whether he suffered an adverse employment action. Plaintiff's reassignments to the front desk and to the jail were not adverse employment actions. A mere inconvenience or an alteration of job responsibilities does not comprise an adverse employment action. *Wilcoxon v Minn Mining & Mfg Co*, 235 Mich App 347, 364; 597 NW2d 250 (1999). An employee's subjective preference for or against a particular assignment is not controlling. *Id*. Plaintiff's reassignments did not comprise a discharge, a threat, or a form of discrimination concerning his compensation or terms or conditions of employment. *Wurtz*, 495 Mich at 251-252. Plaintiff, who was a patrol officer, admitted that patrol officers are rotated onto front desk duties and that they work in the jail. Plaintiff further acknowledged that his pay and benefits were not altered after being assigned to the front desk and the jail; consequently, plaintiff has not established an adverse employment action on these grounds.

Plaintiff claims that he was constructively discharged and that this constituted an adverse employment action. We disagree.

> [A] constructive discharge is not a cause of action, but simply the culmination of alleged wrongful actions that would cause a reasonable person to quit employment. Constructive discharge is a *defense* that a plaintiff interposes to preclude the defendant from claiming that the plaintiff voluntarily left employment. The resignation itself does not constitute a separate cause of action. [*Joliet v Pitoniak*, 475 Mich 30, 41; 715 NW2d 60 (2006) (citations omitted).]

In *Vagts v Perry Drug Stores, Inc*, 204 Mich App 481, 487-488; 516 NW2d 102 (1994) (quotation marks and citations omitted), this Court explained:

-4-

A constructive discharge is established where an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation or, stated differently, when working conditions become so difficult or unpleasant that a reasonable person in the employee's shoes would feel compelled to resign. Where reasonable persons could reach different conclusions regarding whether these elements are established, the issue becomes a question of fact for the jury and not one properly decided by the trial court.

We find persuasive the reasoning in *LaPointe v United Autoworkers Local 600*, 103 F3d 485, 489 (CA 6, 1996), that "an employee who leaves his employment when he has been presented with legitimate options for continued employment with that employer, even in a less prestigious position, is precluded from claiming constructive discharge."[2]

In this case, plaintiff claims he was constructively discharged because while plaintiff was on duty in the jail area of the WPD on June 13, 2012, Green, who was the WPD commissioner, told plaintiff that he would be fired if he left his post. The record contains an audio recording of Green's statements to plaintiff on June 13, 2012. Green told plaintiff:

Okay, I'm ordering you not to leave your post. If you leave your post, I'm going to fire you tomorrow morning. Or no, I'm going to fire you today. I'm going to have a *Loudermill*[3] hearing one hour after you leave this building, and you're gonna be fired. And, I'm preparing a search warrant for your house, and I'm going to do the search warrant regardless of what happens. I have your house right now. And if your neighbors are in your house emptying property out, they're going to be stopped as well. Or your friend or your girlfriend. Because then you are interfering in an investigation, and I will talk to the prosecutor, and I will place you under arrest. [Footnote added.]

Viewed in context, Green was informing plaintiff of the consequences that would ensue if he left his post or interfered in the investigation of plaintiff for identity theft or fraud. The facts underlying this investigation are set forth in affidavits prepared by the WPD for the issuance of search warrants of plaintiff's house and vehicle. On June 11, 2012, plaintiff was being interviewed as part of an internal investigation related to his alleged abuse of overtime. During this interview, four identification cards fell from plaintiff's pocket, which plaintiff attempted to conceal. Three of the cards belonged to deceased persons with respect to whom plaintiff had prepared police reports more than two months earlier. Under WPD policy, an officer is supposed to turn in identification cards immediately after preparing a police report concerning a death. Also, no legitimate reason was found for plaintiff to possess the fourth identification card that fell from his pocket. A fifth identification card was then found in plaintiff's duty bag; this card

---

[2] Although it is not binding, case law from lower federal courts may be considered persuasive authority. *Abela v Gen Motors Corp*, 469 Mich 603, 606-67; 677 NW2d 325 (2004).

[3] *Cleveland Bd of Ed v Loudermill*, 470 US 532; 105 S Ct 1487; 84 L Ed 2d 494 (1985).

belonged to a person that plaintiff had arrested on April 27, 2012 for OUIL 3rd; plaintiff had written in his report that this identification card was destroyed. After learning that this fifth identification card had been found and that his locker had been searched, plaintiff used another officer's cell phone to call plaintiff's neighbors. In one of these calls he told a neighbor to go to plaintiff's house and shred some papers. A district judge authorized the search warrants.

Deposition testimony also reveals that plaintiff engaged in conduct that could reasonably be viewed as concealment efforts in connection with the investigation of him for identity theft or fraud. Plaintiff's testimony reflects that after he was told that his WPD locker would be searched following his failure to explain how he came to possess the identification cards, plaintiff removed items from his locker before it was searched. After being questioned on June 13, 2012 about his concealment efforts related to the locker, plaintiff was informed that his home may be searched. Lieutenant Matheny instructed plaintiff to remain at his post at the jail. Plaintiff claims that he told Matheny that his blood sugar was dropping and that he was not feeling well, and that Matheny yelled at plaintiff. Plaintiff, however, admits that he did not ask his union representative, who was with him at the time, to get him some food. Plaintiff then used another officer's cell phone to call plaintiff's neighbor and told the neighbor to remove a shredder from plaintiff's house.[4] This call was reported to Matheny, who reported it to Green. The WPD contacted plaintiff's neighbor, who said that plaintiff told her to go to his house and shred documents. Based on these escalating events, search warrants were sought and obtained for plaintiff's home and vehicle. Plaintiff resigned later that day after being taken to Green's office. Plaintiff's union representative drove him home.

In light of these facts, we conclude that Green's comments did not create working conditions so difficult or unpleasant that a reasonable person would feel compelled to resign. Green made the comments after plaintiff had engaged in actions that could reasonably be viewed as concealment efforts or attempts to interfere in the investigation of him for identity theft or fraud, including plaintiff's removal of items from his locker after learning it would be searched and his telling a neighbor to shred papers or remove a shredder from plaintiff's home. Green told plaintiff to remain at his post. Plaintiff was told that he would be fired if he left his post and would be arrested if he interfered in the investigation of him for identity theft or fraud. Plaintiff was not denied legitimate options for continued employment with the WPD. If he remained at his post and did not interfere in the investigation, he could have remained employed. Overall, the facts fail to establish a constructive discharge. Plaintiff has not demonstrated a genuine issue

---

[4] As the above discussion indicates, the evidence conflicts concerning whether plaintiff told the neighbor to shred papers that were in the home or to remove the shredder itself. In either event, plaintiff's communication with his neighbor is reasonably viewed as suspicious and an apparent concealment effort given that the phone call was made after plaintiff was told that his house could be searched in connection with the investigation of him for identity theft or fraud.

-6-

of material fact concerning whether he was subjected to an adverse employment action, and defendants are therefore entitled to summary disposition with respect to the WPA claim.[5]

Further, even if plaintiff could show that his reassignments to the front desk and the jail were adverse employment actions or that the events of June 13, 2013, amounted to a constructive discharge, summary disposition would still be appropriate because plaintiff has not demonstrated a genuine issue of material fact concerning causation. Plaintiff has failed to present direct evidence that his protected activity of making verbal reports concerning the Blackmar incident was a motivating factor in the decisions to reassign him to the front desk and the jail or in defendants' conduct related to the investigation of plaintiff on June 13, 2012. Nor has plaintiff presented any circumstantial proof that would facilitate reasonable inferences of causation rather than mere speculation. "The fact that a plaintiff engages in a 'protected activity' under the [WPA] does not immunize him from an otherwise legitimate, or unrelated, adverse job action." *West*, 469 Mich at 187.

As discussed, a temporal relationship is insufficient by itself to demonstrate a causal connection between the protected activity and any adverse employment action. *West*, 469 Mich at 186. Plaintiff presents nothing more than a temporal relationship between his alleged protected activity and the purported adverse job actions. Plaintiff claims to have verbally reported concerning the Blackmar incident of April 14, 2012, after returning to the police station and in the following days. Plaintiff was reassigned to the front desk on May 12, 2012, while internal investigations were pending related to his alleged overtime abuse. Defendants presented

---

[5] Plaintiff also argues that he was subjected to a hostile work environment, asserting that he "was written up improperly, taken off his normal assignment, was beaten down and pushed in a corner basically in the jail. Told to sit and feed prisoners and watch TV and shut my mouth and that's it." (Quotations marks, punctuation, and citation omitted.) Plaintiff also references in support of his hostile work environment claim the allegations that he was placed on the front desk, had his job and freedom threatened, was threatened with a search of his home, and was denied access to medication and candy to treat medical conditions. Plaintiff offers no legal context for his assertion of a hostile work environment. Plaintiff makes no indication that he is seeking to contest the dismissal of his gender discrimination claim that was dismissed earlier in the litigation. Nor does plaintiff articulate whether he is seeking to establish an adverse employment action under the WPA on the basis of a hostile work environment. Plaintiff cites no authority establishing that the existence of a hostile work environment may be asserted to establish an adverse employment action under the WPA. Instead, he cites *Radtke v Everett*, 442 Mich 368, 394-395; 501 NW2d 155 (1993), a case that addressed *sexual harassment* claims under the Civil Rights Act, MCL 37.2101 *et seq*. "A party may not leave it to this Court to search for authority to sustain or reject its position." *Magee v Magee*, 218 Mich App 158, 161; 553 NW2d 363 (1996). Nor may a party simply announce a position and leave it to this Court to unravel and elaborate the party's arguments. *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998). "An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue." *Peterson Novelties, Inc v City of Berkley*, 259 Mich App 1, 14; 672 NW2d 351 (2003).

deposition testimony establishing that a patrol officer who is the subject of multiple internal investigations is routinely assigned to the front desk. Plaintiff was later reassigned to the jail because citizens complained about plaintiff's discourteous behavior at the front desk. Plaintiff testified that he was reassigned to the front desk "[a]s part of retaliation for the Blackmar incident and reporting it." But plaintiff has identified no objective basis for reaching this conclusion. His subjective belief that he was reassigned to the front desk as retaliation for reporting the Blackmar incident amounts to pure speculation based only on a temporal relationship and fails to establish a genuine issue of material fact. *Taylor*, 252 Mich App at 662.

It is also notable that the WPD's internal investigations of plaintiff related to concerns regarding his alleged abuse of overtime pertaining to a timeframe *before* the Blackmar incident. Aherns testified that in December of 2011, plaintiff received a one-day suspension for lying. At that time, Green stated that there was to be no more overtime abuse and directed Aherns to rein in plaintiff's overtime. More overtime issues arose in late April and May of 2012 when plaintiff allegedly used excessive overtime hours to complete a report for an OUIL-3rd arrest, allegedly lied about needing to complete a report that he had already completed in his car, and allegedly arranged to move a court date to a day that he was off duty so he could be paid overtime. This evidence further undermines plaintiff's speculative contention that his reassignments to the front desk and the jail were in retaliation for reporting the Blackmar incident, which occurred *after* the December 2011 directive from Green on overtime issues.

Further, there is no evidence of a causal link between plaintiff's reporting of the Blackmar incident in April 2012 and the events on June 13, 2012, that plaintiff claims amounted to a constructive discharge. Plaintiff's assertion of causation is wholly speculative. But even assuming that plaintiff had presented indirect evidence of a causal connection between his protected activity and the alleged adverse job actions, thereby establishing a rebuttable prima facie case that he was the victim of unlawful retaliation, we conclude defendants would still be entitled to summary disposition because they provided legitimate reasons for their actions and plaintiff failed to rebut those legitimate reasons. *Debano-Griffin*, 493 Mich at 176. As discussed, defendants presented evidence that plaintiff was assigned to the front desk because he was the subject of multiple internal investigations related to alleged overtime abuse, and it was routine WPD policy to assign a patrol officer to the front desk in that situation. Plaintiff was then assigned to the jail because citizens complained about plaintiff's discourteous behavior at the front desk. Defendants also presented evidence that the events on June 13, 2012, including Green's comments to plaintiff on that date, were related to an investigation of plaintiff for identity theft or fraud after multiple identification cards fell from plaintiff's pocket and plaintiff engaged in what appeared to be escalating efforts to thwart this investigation, including by removing items from his locker before it was searched and telling a neighbor to shred papers or remove a shredder from plaintiff's home before a search warrant was executed.

Plaintiff has failed to raise a triable issue that defendants' proffered legitimate reasons were a mere pretext for unlawful retaliation. Again, plaintiff identifies no evidence linking his verbal report regarding the Blackmar incident and the assignment of plaintiff to the front desk and the jail. With respect to the identity theft or fraud investigation of plaintiff, we note that a district judge found probable cause and authorized the search warrants. Plaintiff admitted that as a police officer, he would have had suspicions if someone had three or four identification cards belonging to other people. Further, there is no evidence that Matheny and Green, who were

-8-

investigating the identity theft matter, were even *aware* that plaintiff had supposedly made a verbal report concerning the Blackmar incident to his supervisor, let alone that Matheny and Green engaged in the identity theft investigation of plaintiff as a mere pretext for retaliating against him. Matheny testified that he was not aware plaintiff had reported that the Blackmar arrests were improper.

Plaintiff asserts that defendants' reasons for assigning plaintiff to the front desk and to the jail were unworthy of credence. Plaintiff says the third overtime abuse issue did not arise until after he was placed on the front desk, that the second overtime abuse issue did not involve an actual request for overtime, that no other officer was the subject of three open internal affairs complaints in such a short time, and that no other officer was placed on the front desk for three weeks for the same or similar conduct. Plaintiff claims that the overtime abuse claims involved only "small issues" that were "not worthy of" such punishment, that it took over two weeks for the WPD to take action against plaintiff for the claimed overtime issue involving the OUIL-3rd report, and that plaintiff was improperly disciplined for something he "would have done" because he did not actually claim overtime for the second alleged overtime abuse issue. But plaintiff fails to present an argument concerning precisely how any of these points establish that defendants' proffered legitimate reasons were a pretext *for unlawful retaliation*. *Debano-Griffin*, 493 Mich at 176. Plaintiff may not simply announce his position and leave it to this Court to unravel and elaborate for him his arguments. *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998). We could therefore decline to address these arguments. *Id*.

In any event, plaintiff's arguments do not raise a triable issue concerning pretext. Plaintiff is simply attempting to litigate the merits of the underlying internal investigations concerning his alleged overtime abuse and the propriety of assigning him to the front desk and the jail pending those investigations. This Court is not reviewing those underlying internal investigations. Rather, the sole issue here is whether defendants' asserted reasons for their actions were a mere pretext for unlawful retaliation. The fact that one of the overtime abuse investigations was initiated after plaintiff was assigned to the front desk does not undermine the overall reason for assigning him to that position, i.e., he was the subject of multiple overtime abuse inquiries. As discussed, plaintiff had a history of overtime issues dating back to *before* he claims to have made a verbal report concerning the Blackmar incident. More overtime abuse issues then arose in the period from late April to May of 2012. Plaintiff's contention that one of the overtime abuse issues did not involve an *actual* request for overtime ignores the fact that the investigations were *related* to overtime issues, including allegations that plaintiff had lied about needing to prepare a report that he had already completed. Likewise, plaintiff's claim that he was punished for something he "would have done" ignores that the investigations concerned conduct *related to* overtime abuse and did not necessarily pertain to actual requests for overtime in each individual instance. The fact that no other officer was the subject of three internal investigations opened within a particular amount of time does not establish that the investigations against plaintiff were a mere pretext. Equally plausible explanations are that no other officer engaged in conduct warranting investigations as frequently as plaintiff did, or that any such misconduct by other officers was not discovered. Plaintiff's assertion that the overtime abuse claims involved only "small issues" is a purely subjective characterization that fails to establish that defendants' proffered reasons were pretextual.

Plaintiff also asserts that he was treated differently from another police officer who plaintiff says converted guns to his own use, sold some guns, kept others, and gave some to other officers. Plaintiff says that this other officer's home was not searched but plaintiff's home was. Plaintiff fails to cite authority with respect to this argument or to explain how the treatment of the other officer establishes that defendants' conduct with respect to plaintiff was a pretext for unlawful retaliation; consequently, this argument may be deemed waived. *Wilson*, 457 Mich at 243; *Peterson Novelties, Inc v City of Berkley*, 259 Mich App 1, 14; 672 NW2d 351 (2003). In any event, plaintiff's argument fails to rebut defendants' proffered legitimate reasons for investigating plaintiff for identity theft or fraud. The record is inadequate to allow a conclusion that plaintiff and the other officer were so similarly situated that any disparity in their treatment establishes that the treatment of plaintiff was a pretext for unlawful retaliation. As discussed, plaintiff engaged in an escalating series of acts that suggested he was attempting to hide wrongdoing, including by attempting to conceal multiple identification cards that fell from his pocket, by removing items from his locker after being told that it could be searched, and then by asking a neighbor to shred documents or to remove a shredder from his home. Plaintiff identifies no similar series of escalating concealment efforts in the other officer's case.

Plaintiff also criticizes the WPD's handling of the Blackmar incident. Plaintiff asserts that the WPD performed no "real" investigation of the Blackmar incident because plaintiff and other officers were not interviewed. Defendant emphasizes that Green did not watch the video of the Blackmar incident. Plaintiff asserts that these facts reflect an effort to cover up the Blackmar incident and to retaliate against plaintiff and to silence him about what happened there. Plaintiff says that one of the teenagers at the Blackmar incident was charged with "lunging at an officer" after the teenager was already handcuffed. Plaintiff says that an officer's admitting to using profanity during the Blackmar incident for which he received a one-day suspension fails to reflect that there was a false arrest and an illegal entry into a home. Plaintiff makes other assertions regarding purported efforts by the WPD to "cover up" the Blackmar incident.

Plaintiff's argument again loses sight of the legal elements of his WPA claim. Plaintiff essentially seeks to challenge the propriety of the underlying arrests on Blackmar and the WPD's investigation of that matter. This appeal is not from an administrative determination concerning the WPD's handling of the Blackmar incident; this case concerns a WPA claim filed by plaintiff. Plaintiff presented evidence that he engaged in a protected activity by making verbal reports of an alleged illegal arrest at the Blackmar incident. Therefore, we accept for purposes of plaintiff's argument that the arrests at Blackmar may have been illegal and that plaintiff reported this fact. The issue now is whether any adverse job actions against plaintiff comprised a mere pretext to retaliate against him for making those reports. The purported impropriety of the Blackmar arrests and the alleged inadequacy of the WPD's investigation do not establish that the claimed adverse job actions against plaintiff were pretexts for unlawful retaliation. Indeed, *every* WPA case involves a claim that a violation or a suspected violation of a law or regulation occurred. See MCL 15.362. Further, it is common sense that an employee typically reports a violation to a public body only when the employer has not adequately addressed the matter; that is, if the employer had *already* adequately addressed the alleged legal violation, then no protected activity would generally be needed. It therefore follows that if the mere existence of a violation and of the employer's failure to conduct an adequate investigation sufficed to establish pretext, then pretext would exist virtually whenever a protected activity is established. This would essentially conflate the separate elements of a protected activity and causation. Plaintiff's

arguments challenging the legality of the Blackmar arrests and the adequacy of the WPD's investigation are therefore inapposite with respect to the element at issue.

Plaintiff further contends that the officer who signed the search warrant affidavit, Sergeant Stephen Mills, testified that he was not told that there had been an investigation before he signed the affidavit and that such information would have been valuable to him. Plaintiff asserts that this investigation cleared him of any wrongdoing. Plaintiff says that this proves that the search warrant "was concocted to get it past the judge who signed off on the search warrant" and that it supports plaintiff's position that defendants' claimed legitimate actions lacked credibility. This argument is devoid of merit. It is true that Mills testified that he did not learn until after the search warrant was executed that credit reports had been run on the persons whose identification cards plaintiff possessed and that those searches did not turn up any suspicious activity. Mills indicated that this information would have helped him decide whether to put his name on the search warrant affidavit. Although this information may have tended to exculpate plaintiff, plaintiff overstates his argument in saying that it cleared him of any wrongdoing. The fact that credit reports did not reveal any suspicious activity at that point did not preclude further investigation concerning plaintiff's possession of multiple identification cards and his apparent concealment efforts described earlier.[6] The facts plaintiff cited fail to establish that defendants were undertaking the identity theft investigation as a mere pretext to retaliate against plaintiff. Because plaintiff has presented no evidence that defendants' proffered legitimate reasons for their actions were a pretext for unlawful retaliation, we conclude defendants are entitled to summary disposition. *Debano-Griffin*, 493 Mich at 176; *Hazle*, 464 Mich at 465-466, 477.

Plaintiff next argues that he presented a genuine issue of material fact concerning his claim of intentional infliction of emotional distress. We disagree.

> In order to establish intentional or reckless infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. Liability attaches only when a plaintiff can demonstrate that the defendant's conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. A defendant is not liable for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

> The test to determine whether a person's conduct was extreme and outrageous is whether recitation of the facts of the case to an average member of the community would arouse his resentment against the actor, and lead him to

---

[6] Plaintiff's argument overlooks the fact that one could engage in identity theft in ways that might not be reflected on the victim's credit report. See MCL 445.65(1)(a) (stating that a person shall not, with intent to defraud or violate the law, use or attempt to use another person's personal identifying information to "[o]btain credit, goods, services, money, property, a vital record, a confidential telephone record, medical records or information, or employment" or to "[c]ommit another unlawful act.").

exclaim, "Outrageous!" In reviewing claims of intentional or reckless infliction of emotional distress, it is generally the trial court's duty to determine whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. Where reasonable minds may differ, whether a defendant's conduct is so extreme and outrageous as to impose liability is a question for the jury. [*Lewis v LeGrow*, 258 Mich App 175, 196-197; 670 NW2d 675 (2003) (quotation marks and citations omitted).]

Plaintiff contends that defendants engaged in extreme and outrageous conduct because plaintiff was not allowed his candy and medication to treat his medical conditions; Green threatened to search plaintiff's home, and plaintiff's union representative said plaintiff would be arrested if he went back to his house. Plaintiff asserts that defendants knew plaintiff was diabetic and attempted to cover up this fact. He further contends that the trial court essentially covered for defendants by stating that plaintiff did not officially notify defendants that he was diabetic. Plaintiff says he was later held against his will in a guarded room, was still not allowed to get his medication or candy, and was yelled at and threatened by Green.

Plaintiff's argument lacks merit. As discussed, plaintiff was suspected of identity theft or fraud during the events of June 13, 2012. There was ample evidence to support the WPD's suspicions. Plaintiff admitted that he would have had suspicions if a person had three or four identification cards belonging to other people. As a matter of law, a police officer is not liable for intentional infliction of emotional distress for pursuing an arrest warrant on the basis of presumptively credible information amounting to probable cause. *Walsh*, 263 Mich App at 634. Green's comments to plaintiff were reasonable efforts to communicate what would happen if plaintiff abandoned his post or attempted to interfere in the investigation of him for identity theft.

Plaintiff's claim that he was denied access to his candy and medication to treat his medical condition is inadequately supported. Plaintiff testified that he told Matheny that his sugar was dropping and that Matheny at some point told plaintiff that he could not abandon his post. But there is no evidence that Matheny was aware of plaintiff's diabetic condition or that plaintiff told Matheny that he needed candy or medication and that Matheny then denied plaintiff access to these items. Likewise, Green testified that he was not aware that plaintiff has diabetes and that plaintiff never reported to the WPD that he was diabetic. Green said plaintiff's file does not indicate he is diabetic.[7] Green testified that orange juice and food are available in the jail for

---

[7] In March of 2009, plaintiff indicated in a communication to a prior commissioner of the WPD in connection with another overtime abuse investigation of plaintiff: "Note: I have diabetes and my sugar was low. I saw 7-11 and went to get a coffee with extra sugar in it." This communication was referenced in the trial court's opinion and order granting defendants' earlier motion for summary disposition concerning plaintiff's Persons With Disabilities Civil Rights Act and gender discrimination claims. We conclude that the reference to plaintiff's diabetic condition in a communication to a prior commissioner in respect to a separate internal investigation of plaintiff in 2009 does not facilitate a reasonable inference that Matheny or Green had knowledge of plaintiff's diabetes at the time of the relevant events in this case.

-12-

diabetic prisoners and that plaintiff never told Green that he was sick and needed medication or a rest. According to Green, plaintiff brought a lunch with him that day that he took home with him when he resigned. Also, plaintiff admitted that he did not ask his union representative, who was with him at the time, to get him some food. After plaintiff was taken to Green's office and resigned, plaintiff was escorted to his locker, where he ate candy and took medicine.

Overall, we conclude that plaintiff has failed to establish a genuine issue of material fact regarding extreme and outrageous conduct. Summary disposition was therefore properly granted on plaintiff's intentional infliction of emotional distress claim.

Plaintiff next argues that he presented a genuine issue of material fact regarding his false imprisonment claim. We disagree. False imprisonment requires "an unlawful restraint on a person's liberty or freedom of movement." *Peterson Novelties*, 259 Mich App at 17. "The elements of false imprisonment are (1) an act committed with the intention of confining another, (2) the act directly or indirectly results in such confinement, and (3) the person confined is conscious of his confinement." *Moore v Detroit*, 252 Mich App 384, 387; 652 NW2d 688 (2002) (quotation marks and citations omitted). "[B]rief confinements or restraints are insufficient for false imprisonment." *Id*. at 388. An essential component of a false imprisonment claim is that the imprisonment was false, i.e., that the defendant lacked any right or authority to confine the plaintiff. *Id*. Stated differently, to be "false," the restraint must be illegal, i.e., must have occurred without probable cause or other lawful authority to support it. See *Id*.; see also *Walsh*, 263 Mich App at 627, and *Peterson Novelties*, 259 Mich App at 18.

> Probable cause involves a determination of both the historical facts and whether the rule of law as applied to the facts is violated. Want of probable cause is a question of law to be determined by the court. Where the facts on which the issue turns are in dispute, the question is for the jury. To constitute probable cause, there must be such reasonable grounds of suspicion, supported by circumstances sufficiently strong in themselves to warrant an ordinarily cautious man in the belief that the person arrested is guilty of the offense charged. Probable cause is a commonsense concept dealing with practical considerations of everyday life that must be viewed from the perspective of reasonable and prudent persons, not legal technicians. [*Walsh*, 263 Mich App at 628 (quotation marks, punctuation, and citations omitted).]

It is well established a police officer may form probable cause as to suspected illegality on the basis of the presumptively reliable information related to him by other officers. *Id*. at 630.

Plaintiff contends that he was falsely imprisoned because on June 13, 2012, he was not allowed to leave the jail, was then locked in a guarded room for approximately 10 minutes, and was later escorted to Green's office. However, plaintiff was on duty as a police officer at the jail on that day. The fact that plaintiff was instructed not to leave his post if he wished to remain employed did not establish that he suffered an unlawful restraint on his liberty or freedom of movement. It was plaintiff's choice to work for the WPD as a police officer, and his obligation to stay at his post was a function of his employment. To the extent plaintiff was later directed to remain in a guarded conference room or escorted to Green's office, we note that any confinement or restraint was relatively brief and insufficient for false imprisonment. *Moore*, 252 Mich App at

388. Further, even if plaintiff were confined, he was not *falsely* imprisoned because the WPD had probable cause to suspect that plaintiff committed identity theft and was actively engaged in obstructing an ongoing investigation. As discussed, plaintiff dropped multiple identification cards from his pocket in front of command officers, attempted to conceal the cards, removed items from his locker after being told that it would be searched, and told a neighbor to remove a shredder from plaintiff's home or to shred papers after learning that his home would be searched. Plaintiff admitted that he would be suspicious of someone who had multiple identification cards. Overall, the WPD had reasonable grounds to suspect that plaintiff committed identity theft. Any brief confinement to prevent plaintiff from continuing his apparent and escalating efforts to interfere in the investigation during the search of his home was supported by probable cause. Therefore, plaintiff has not established a genuine issue of material fact concerning his false imprisonment claim.

Finally, plaintiff argues that the trial court erred in granting summary disposition to defendants on plaintiff's conspiracy and concert of actions claims. We disagree. "A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Admiral Ins Co v Columbia Cas Ins Co*, 194 Mich App 300, 313; 486 NW2d 351 (1992). Where a plaintiff fails to establish any tortious conduct, the plaintiff's conspiracy action must also fail. *Id.*; see also *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 257 Mich App 365, 384; 670 NW2d 569 (2003) ("Because plaintiffs failed to establish any actionable underlying tort, the conspiracy claim must also fail."). Similarly, plaintiff's concert of action claim fails. *Urbain v Beierling*, 301 Mich App 114, 132; 835 NW2d 455 (2013) ("For both civil conspiracy and concert of action, the plaintiff must establish some underlying tortious conduct.").

In this case, plaintiff relies on the same underlying facts to support his civil conspiracy and concert of action claims that he used to assert his WPA, false imprisonment, and intentional infliction of emotional distress claims. Plaintiff argues that defendants conspired and acted with a common purpose and design to retaliate against him to silence him about the Blackmar incident, that they conspired to falsely imprison plaintiff and illegally search his home and car, and that they had Sergeant Mills sign a search warrant affidavit without telling him that plaintiff had been cleared of wrongdoing. As discussed, plaintiff has failed to demonstrate a genuine issue of material fact concerning his WPA, intentional infliction of emotional distress, and false imprisonment claims. Plaintiff identifies no other tort that he thinks the underlying facts establish. "Given that plaintiff has not established that defendants committed an underlying tort, [he] cannot sustain [his] claims of concert of action and civil conspiracy. Accordingly, the trial court properly granted summary disposition on those claims." *Id*.

We affirm. As the prevailing party, defendants may tax costs pursuant to MCR. 7.219.

/s/ Jane E. Markey
/s/ Donald S. Owens
/s/ Elizabeth L. Gleicher

-14-